[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 851 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 852 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 853 
OPINION
Governor Arnold Schwarzenegger appeals from the superior court's order granting petitioner Arnold Jacobson's petition for writ of habeas corpus, and vacating the Governor's decision to reverse the Board of Parole Hearings' determination that petitioner is suitable for parole. (Pen. Code, § 1507.)[1] We reverse the superior court's order. In doing so, we apply the "extremely deferential" standard of review of the Governor's decision compelled by In re Rosenkrantz (2002) 29 Cal.4th 616
[128 Cal.Rptr.2d 104, 59 P.3d 174] (Rosenkrantz) — a standard that examines only whether the factual basis on which the Governor relies to deny parole gives due consideration to the factors he is required by law to consider as applicable to the particular inmate, is drawn from the record before the board, and is supported by "some evidence" in that record. We disagree with the recent decisions of some courts of appeal (In re Cooper (2007) 153 Cal.App.4th 1043 [62 Cal.Rptr.3d 907], In reLawrence (2007) 150 Cal.App.4th 1511 [59 Cal.Rptr.3d 537], In reElkins (2006) 144 Cal.App.4th 475 [50 Cal.Rptr.3d 503], In re Lee
(2006) 143 Cal.App.4th 1400 [49 Cal.Rptr.3d 931] and In re Scott
(2005) 133 Cal.App.4th 573 [34 Cal.Rptr.3d 905]), which have transmuted the Rosenkrantz standard into one that permits the court to reweigh evidence, recalibrate relevant factors, and reach an independent determination. whether the inmate continues to pose a risk to public safety. (See also In re Roderick (2007) 154 Cal.App.4th 242
[overturning parole denial by Board of Parole Hearings].) *Page 854 
 FACTUAL AND PROCEDURAL BACKGROUND In an October 1985 nonjury trial, a judge convicted petitioner of one count of second degree murder (Pen. Code, § 187)[2] and one count of attempted murder (§§ 664, 187), finding that he used a firearm (§ 12022.5) in both crimes. On the murder count, the judge sentenced him to a term of 17 years to life in state prison (15 years to life for murder, plus two years for the handgun use enhancement), and a concurrent term of nine years for the attempted murder.
 The convictions arose from a shooting on March 13, 1985, when petitioner was 59 years old. The attempted murder victim was petitioner's ex-girlfriend, Sonja Sharlow; the murder victim was Sharlow's friend, Patty Silviera.
 On the night of the shooting, petitioner followed Sharlow to a bar in Long Beach, the Barge Inn. Petitioner had been following Sharlow frequently since their breakup. When Sharlow saw petitioner in his camper truck in the parking lot, she ran toward the bar. Petitioner shot her in the leg with a .25-caliber pistol. Sharlow was able to enter the bar, where she told her friend, Silviera, what had happened. Silviera had been acting as an intermediary between petitioner and Sharlow in petitioner's attempt at reconciliation. Silviera ran out of the bar to petitioner's camper. Petitioner shot her in the chest at close range, killing her. Petitioner fled in his camper. Later, police found one .25-caliber bullet and four spent .25-caliber shell casings at the scene. Petitioner abandoned his truck, discarded the gun, and fled the state. He later returned to California, and was apprehended on March 25, 1985.
 At trial, petitioner testified that he was intoxicated at the time of the shooting, and did not intend to injure either Sharlow or Silviera. He had been drinking all day, and followed Sharlow to the Barge Inn. When Sharlow got out of her car, he asked to speak to her, but she ran toward the bar. Petitioner retrieved a handgun from under a mattress in the back of his camper, and fired. Then Silviera suddenly appeared beside his truck. Petitioner was holding the gun in his right hand, leaning against the door. Startled by Silviera, petitioner jerked back, and the gun went off.
 In convicting petitioner of second degree murder in the killing of Silviera, the judge rejected petitioner's version of events. On appeal, this court affirmed the judgment. We held that substantial evidence supported the trial judge's findings that "appellant's capacity for malice was not impaired by voluntary intoxication since he was able to drive his camper truck all day, recalled the entire day's events, and had known where to quickly retrieve his *Page 855 
handgun. Malice aforethought for second degree murder was implied because appellant was familiar with guns yet deliberately shot Silviera in the chest at close range without provocation, showing a conscious disregard for human life."
 Petitioner was received by the California Department of Corrections on November 6, 1985. The Department set his minimum eligible parole date as July 26, 1995.
 In his ninth parole review on April 7, 2005, the board found petitioner suitable for parole.[3] He was then age 80, and had served more than 19 years in prison since his commitment. In finding that petitioner would not pose an unreasonable risk of danger to public safety, the board cited many positive factors supported by the record. Before his prison commitment, petitioner had no significant criminal history. While in prison, he had only three disciplinary violations. The most recent (a Sept. 1992 citation for conspiracy to introduce dangerous contraband) occurred more than 12 years earlier, and was reduced to an administrative violation. Petitioner had consistently participated in Narcotics Anonymous and Alcoholics Anonymous. He had realistic parole plans, which included a prospective residence and job, Social Security income, and a support system provided by fellow military veterans involved in the American Legion. According to the board, petitioner had shown "signs of remorse and indicates that he understands the nature and the magnitude of his crime. He accepted responsibility for it and [has] a desire to change towards good citizenship." The board noted that a 2003 report from his correctional counselor, and reports from psychologists in 1999 and 2001, expressed the opinion that petitioner posed a minimal risk to public safety. The 2001 psychological report stated that given petitioner's "history, his mental condition, his age and physical health [petitioner suffers from a fused left knee] it is difficult to see him as becoming in any way dangerous."
 On August 24, 2005, the Governor reversed the board's parole grant. In his written decision, the Governor noted that petitioner "has remained discipline-free since 1992" and "has also taken steps in prison to enhance his ability to function within the law upon release. He has received vocational training through various institutional jobs, has participated in an array of self-help and therapy . . ., and has received positive evaluations from mental-health and correctional professionals. Likewise, he has made confirmed parole plans that include housing arrangements and legitimate means for financial support. These are all factors supportive of [petitioner's] release to parole." *Page 856 
 However, based on the circumstances of petitioner's commitment offense, the Governor concluded that petitioner posed an unreasonable risk of danger if paroled. Although the board had cited petitioner's acceptance of responsibility for the murder of Patty Silviera and his understanding of the nature and magnitude of his crime, the Governor questioned the extent of petitioner's true acceptance of responsibility, and questioned petitioner's consequent expressions of remorse. The Governor observed that petitioner consistently maintained that he killed Patty Silviera only because "when [he was] sitting in his truck with the gun still in his hand after shooting Ms. Sharlow, he was startled by Ms. Silviera's confrontation and made a jerking motion causing the gun to discharge." The Governor noted, however, that "the trial court [that heard the evidence] did not believe [petitioner's] version of the crime and found him guilty of second-degree murder. Moreover, the Court of Appeal, in its opinion affirming the judgment . . . concluded, `[m]alice aforethought for second degree murder was implied because [petitioner] was familiar with guns yet deliberately shot . . . Silviera in the chest at close range without provocation, showing a conscious disregard for human life.'"
 The Governor found the killing of Silviera to be particularly aggravated: "[Petitioner] followed [Sonja] Sharlow to a bar, shot and wounded her when she refused to talk to him, and then shot . . . Silviera in the chest `deliberately' and `at close range' when she tried to approach him afterwards. [Petitioner's] murderous actions make the life offense for which he was convicted especially grave because they included his violent victimization of two women — resulting in his conviction for both murder and attempted murder and exceeding the minimum necessary to sustain a conviction for second-degree murder. The gravity of the murder committed by [petitioner] is alone a sufficient basis to conclude at this time that his release from prison would pose an unreasonable public-safety risk." The Governor also noted that although petitioner "told the 2003 Board that he could not remember how many gunshots he fired in total, the appellate decision stated that one bullet and four casings were found at the crime scene, indicating that [petitioner] fired multiple shots in the parking lot that night."
 The Governor discounted petitioner's current age as a factor favoring parole. "At 80 years old now, [petitioner] has been in prison for a long time and can be said to have a reduced likelihood for recidivism due to his advanced age. Nevertheless, [he] was 59 years old when he armed himself with a .25-caliber handgun and shot two women, killing one of them, and his age is not a factor tipping the scales in favor of his parole suitability at this time."
 The Governor concluded: "After carefully considering the very same factors the board is required to consider, I find the gravity of the second-degree murder committed by [petitioner] presently outweighs the factors *Page 857 
tending to support his release. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the board's 2005 decision to grant parole."
 Petitioner filed a petition for writ of habeas corpus in the superior court challenging the Governor's decision. After issuing an order to show cause and receiving briefing, the superior court granted the petition. Applying the "some evidence" standard of review as construed in In reScott, supra, 133 Cal.App.4th 573 and In re Lee, supra,143 Cal.App.4th 1400, the court reasoned that the Governor's decision was unsupported. According to the court, the record did not support the Governor's finding that petitioner had not genuinely accepted responsibility for the murder and expressed remorse. In any event, according to the court, there was no connection between petitioner's portrayal of the murder and the conclusion that petitioner would pose an unreasonable risk if released. The court discounted the predictive value of petitioner's crimes given the lapse of time since their commission and petitioner's current age. The evidence before the board demonstrated that petitioner would not pose a risk if released, and no evidence suggests that petitioner was likely to commit another crime. Therefore, the court granted the petition for writ of habeas corpus, and ordered petitioner released on parole in accordance with the board's determination.
 DISCUSSION The Governor contends that in setting aside his decision to reverse the board's grant of parole to petitioner, the superior court failed to apply the deferential standard of review required by In re Rosenkrantz,supra, 29 Cal.4th 616. We agree.
The Proper Standard of Review
 The California Constitution (art. V, § 8, subd. (b)) and Penal Code (§ 3041.2) grant the Governor the authority to review the board's decision to parole an inmate convicted of murder. The Governor's review, though de novo, is governed by the same factors which the board must consider, and is restricted to the record presented to the board. (Rosenkrantz, supra, 29 Cal.4th at pp. 625-626, 660, 667.) For murders committed after 1978, the relevant factors appear in title 15, division 2, chapter 3, article 11 of the California Code of Regulations.[4]
 The overarching discretionary determination to be made by the board, and hence by the Governor as well, is whether "the prisoner will pose an *Page 858 
unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a); see Pen. Code, § 3041, subd. (b).) Among the numerous factors to be considered in making this discretionary determination are "the base and other commitment offenses, including behavior before, during and after the crime" and the inmate's "past and present attitude toward the crime." (Cal. Code Regs., tit. 15, § 2402, subd. (b).) Parole is disfavored if the inmate "committed the offense in an especially heinous, atrocious or cruel manner" — a factor that requires considering, inter alia, whether "[m]ultiple victims were attacked, injured or killed in the same or separate incidents," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subds. (c)(1)(A), (E).) *Page 859 
 The circumstances of the crime alone may support the Governor's decision to deny parole. (Rosenkrantz, supra, 29 Cal.4th at pp. 682-683.) In evaluating the crime, the Governor is not bound by the evidence credited by the fact finder at trial. Rather, the Governor may independently evaluate the evidence to determine whether, in his judgment, the circumstances of the crime dictate denial of parole. (Id.
at p. 679.)
 A parole denial based on the circumstances of the offense might violate due process under the California Constitution "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . .' (Pen. Code, § 3041, subd. (a).) `. . . Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date'" (Rosenkrantz, supra, 29 Cal.4th at p. 683, italics added), meaning that "the violence or viciousness of the inmate's crime must be more thanminimally necessary to convict him of the offense for which he is confined." (In re Dannenberg (2005) 34 Cal.4th 1061, 1095 [23 Cal.Rptr.3d 417, 104 P.3d 783] (Dannenberg).)
 If the Governor overturns a grant of parole, judicial review of the decision is "extremely deferential." (Rosenkrantz, supra,29 Cal.4th at p. 665.) "[A] court is authorized to review the factualbasis of the Governor's *Page 860 
decision [to reverse a parole grant] only to determine whether it is supported by some evidence relevant to the factors the Governor is required to consider under article V, section 8(b)," of the California Constitution. (Id. at p. 626, italics added.) So long as the factual basis of the Governor's decision is supported by a "modicum of evidence" relevant to the factors he must consider, the court cannot set the decision aside. (Id. at p. 677.)
 Further, in determining whether the factual basis of the Governor's decision is supported by "some evidence," the court's review of the record is tightly constrained. "Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. As with the discretion exercised by the Board in making its decision, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor, but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (Rosenkrantz, supra, 29 Cal.4th at p. 677.) Similarly, when the Governor denies parole on the basis of the circumstances of the commitment offense, the court's review is strictly "limited to whether some evidence supports the Governor's assessment of the circumstances of petitioner's crime — not whether the weight of the evidence conflicts with that assessment." (Id. at p. 679.)
 Recent decisions from some courts of appeal have departed from the standard of review prescribed by Rosenkrantz, transmuting theRosencrantz extremely deferential review into one that reweighs the evidence, recalibrates the relevant factors, and permits an independent determination whether the inmate continues to pose a risk to public safety. (See In re Lawrence, supra, 150 Cal.App.4th at p. 1533 ["the appellate court can uphold the Board or Governor's denial of parole if there is some evidence the prisoner's commitment offense was `more violent and vicious than minimally necessary to convict of that offense' such that it provides `relevant evidence' that `public safety requires a lengthier period of incarceration'"]; In re Elkins, supra,144 Cal.App.4th at p. 496 [because "`the predictive value of the commitment offense may be very questionable after a long period of time,'" the Governor's denial of parole "`solely on the basis of the gravity of the commitment offense warrants especially close scrutiny'" (quoting In re Scott, supra, 133 Cal.App.4th at p. 595) (italics added by Elkins)]; In re Lee, supra, 143 Cal.App.4th at p. 1408 ["[t]he test is not whether some evidence supports the *Page 861 reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. . . . Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety" (citations omitted)]; see also In re Cooper,supra, 153 Cal.App.4th at p. 1060 [reviewing Governor's decision to deny parole under the standards of Lee and Elkins]; In re Roderick,supra, 154 Cal.App.4th at p. 263 [applying nondeferential standard to Board's decision to deny parole].)
 The standard of review described in these decisions has no basis inRosenkrantz. The reviewing court does not reassess the inference of future dangerousness to be drawn from the factual basis of the Governor's decision. (See Rosenkrantz, supra, 29 Cal.4th at pp. 676-677; see also Inre Roderick, supra, 154 Cal.App.4th 242 (dis. opn. of Sepulveda, J., dissenting); and In re Lawrence, supra, 150 Cal.App.4th at p. 1563 (dis opn. of Perluss, P. J., dissenting).) Rather, the court determines only whether the factual basis on which the Governor relies — which must be tailored to the individual inmate and give due consideration to the factors the Governor is required by law to consider — is supported by "some evidence" in the record before the board. If it is, the court is powerless to strike the balance of relevant factors differently, and powerless to declare that the inmate no longer poses a risk to public safety. Or as stated in Rosenkrantz: "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision." (Rosenkrantz, at p. 677.)
 Rosenkrantz simply does not permit the type of scrutiny described in these decisions (Lawrence, Elkins, Scott, Lee, Cooper, and Roderick), and we decline to follow them.[5] *Page 862 
The Proper Standard of Review Applied
 In the instant case, the superior court followed the lead of In reScott, supra, 133 Cal.App.4th 573 and In re Lee, supra,143 Cal.App.4th 1400, and conducted a less deferential review of the Governor's decision than permitted by Rosenkrantz. Under the proper standard, the Governor's decision must be upheld.
 The Governor provided petitioner an individualized review of the relevant factors, and concluded that the gravity of the commitment offense outweighed the factors tending to support petitioner's release. The Governor noted petitioner's positive achievements in prison — no disciplinary incident since 1992, vocational training and prison employment, participation in therapy, and viable plans upon release from parole. The Governor also noted the positive evaluations from mental health and corrections officials.
 However, the Governor questioned the board's reliance on petitioner's expressions of remorse and willingness to take responsibility for the murder of Patty Silviera. An inmate's "past and present attitude toward the crime," and "[s]igns of remorse" (Cal. Code Regs., tit. 15, § 2402, subds. (b), (d)(3)) are relevant considerations in determining whether to grant parole. The Governor correctly noted that petitioner has consistently portrayed the murder as resulting from an accidental discharge of his firearm. At the April 2005 hearing that resulted in the board granting parole, petitioner adopted his prior version of the killing — essentially the same version he had given in his trial testimony. He claimed that he was intoxicated, and that Silviera "startled [him] when she appeared beside his truck. He fired in Silviera's direction as he jerked back, fatally wounding her." He claimed that "when the victim [Silviera] confronted him, he panicked. After he heard the gunshot go off, he did not see the victim anymore, so he drove away in a panic."
 The Governor was not required to credit petitioner's version. (Rosenkrantz, supra, 29 Cal.4th at p. 679.) Indeed, as the Governor noted, the trial court did not believe defendant's account, and convicted petitioner of second degree murder. Further, in affirming the judgment, the Court of Appeal found the evidence sufficient to prove implied malice — petitioner "was familiar with guns yet deliberately shot . . . Silviera in the chest at close range without provocation, showing a conscious disregard for human life." (Italics added.) There is some evidence to support the Governor's finding that the killing of Silviera was not accidental, but deliberate.
 Petitioner contends that the Governor's disbelief of petitioner's version of the crime and of his expressions of remorse runs afoul of section 5011, subdivision (b). Under that provision, the board "shall not require, when *Page 863 
setting parole dates, an admission of guilt to any crime for which an inmate was committed." Petitioner incorrectly argues that Dannenberg
relied on section 5011 to prohibit the board's denial of a parole date because of an inmate's failure to accept the board's version of the crime. Dannenberg declined to address the "technical validity" of the argument, because "any error by the Board in this respect was harmless. It appears manifest that the Board's reference to Dannenberg's failure to take responsibility was peripheral to its decision and did not affect the outcome." (Dannenberg, supra, 34 Cal.4th at p. 1099.)
 In the instant case, the Governor's decision did not violate section 5011. In granting parole, the board concluded that petitioner had shown "signs of remorse and indicates that he understands the nature and the magnitude of his crime. He accepted responsibility for it and [has] a desire to change towards good citizenship." (See Cal. Code Regs., tit.15, § 2402, subd. (d)(3) [factors determining suitability for parole include "[t]he prisoner performed acts which tend to indicate the presence of remorse, such as . . . indicating that he understands the nature and magnitude of the offense"].) In the Governor's view, however, petitioner has not indicated an understanding of the nature and magnitude of his crime in the killing of Silviera, and has not fully accepted responsibility for it, because he continues to maintain it was purely an accident. The Governor's disagreement with the board's assessment is not tantamount to requiring petitioner to admit guilt in order to be paroled, but rather constitutes a permissible questioning of the validity of the board's finding that petitioner's attitude toward the crime, and his expressions of remorse, truly militate in favor of parole. Nothing in the Governor's decision suggests that he would require petitioner to concur in the conclusion that he deliberately shot Silviera; and nothing in section 5011 precludes the Governor from pointing out perceived flaws in the board's reasoning concerning petitioner's attitude toward the commitment offense.
 In any event, the Governor's decision to deny parole was based primarily on his view of the circumstances of the crime. On the record here, and under the Rosenkrantz standard (properly applied), that factor alone is sufficient to support the Governor's decision. (See Dannenberg,supra, 34 Cal.4th at p. 1099.) The Governor legitimately concluded that petitioner fired multiple shots (one bullet and four shell casings were found at the scene), and that "[petitioner's] murderous actions make the life offense for which he was convicted especially grave because they included his violent victimization of two women — resulting in his conviction for both murder and attempted murder and exceeding the minimum necessary to sustain a conviction for second-degree murder." Two considerations disfavoring parole are that "[m]ultiple victims were attacked, injured or killed in the same or separate incidents," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subds. (c)(1)(A), *Page 864 
(E).) As the Governor noted, the evidence suggested that in a single incident petitioner deliberately shot two women — one (Sharlow) because she refused to talk to him; the other (Silviera) when she tried to approach him. Because there is some evidence to support the Governor's finding that two women were deliberately shot for trivial reasons, resulting in the attempted murder of one and the second degree murder of the other in the same incident, there is necessarily some evidence to support the conclusion that the murder of Silviera was "particularly egregious" (Rosenkrantz, supra, 29 Cal.4th at p. 683), in that it involved a level of "violence or viciousness . . . more than minimallynecessary to convict [petitioner] of the offense for which he is confined." (Dannenberg, supra, 34 Cal.4th at p. 1095.) Therefore, the circumstances of the offense alone justify the Governor's decision. (Rosenkrantz, supra, 29 Cal.4th at p. 683; see also Dannenberg, supra,34 Cal.4th at p. 1095.)
 Relying on In re Ramirez (2001) 94 Cal.App.4th 549 [114 Cal.Rptr.2d 381], petitioner contends that for the commitment offense to be deemed particularly egregious it must be compared to other incidents of the same or similar criminal conduct. Petitioner asserts that Dannenberg reaffirmed Ramirez on this point. However, Dannenberg
overruled Ramirez to the extent it would require comparative review of other crimes. (Dannenberg, supra, 34 Cal.4th at pp. 1071, 1100.)Dannenberg held: "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (Id. at p. 1071.)
 The Governor recognized that petitioner's age (80) "reduced likelihood for recidivism." But the Governor discounted age as a factor suggesting parole is appropriate, noting that petitioner had committed murder and attempted murder at age 59 by arming himself with a handgun and shooting two women. This balancing of petitioner's current age against his age at the time of the commitment offense, and against the circumstances of the crime, is part of the broad discretion given the Governor in determining whether to overturn a parole decision by the board. The balance struck is supported by some evidence, and is not wholly irrational.
 We do not re weigh the relevant factors. We do not determine whether the weight of the evidence — even the overwhelming weight — supports a grant of parole. We do not give independent scrutiny to the Governor's decision whether petitioner continues to pose a danger. We apply, rather, the extremely deferential standard required by Rosenkrantz.
Because the factual basis on which the Governor relied to deny parole was tailored to petitioner and gave due consideration to the factors the Governor is required to consider, and *Page 865 
because it was drawn from the record before the board and is supported by "some evidence" in that record, we uphold the Governor's decision. (Rosenkrantz, supra, 29 Cal.4th at pp. 676-677.)
 DISPOSITION
The order is reversed.
Epstein, P. J., and Manella, J., concurred.
[1]The notice of appeal also named Bob Horel, the acting warden of California State Prison, Solano, as an appellant.
[2]All subsequent undesignated statutory references are to the Penal Code.
[3]Without citation to the record, petitioner states in his respondent's brief that the board had previously found him suitable for parole in October 2002, but Governor Gray Davis reversed the decision in March 2003.
[4] California Code of Regulations, title 15, section 2402 states:
 "(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
 "(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.
 "(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:
 "(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
 "(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
 "(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
 "(C) The victim was abused, defiled or mutilated during or after the offense.
 "(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
 "(E) The motive for the crime is inexplicable or very trivial in relation to the offense.
 "(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
 "(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.
 "(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
 "(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
 "(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail."
 (d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:
 "(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
 "(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
 "(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
 "(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.
 "(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.
 "(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
 "(7) Age. The prisoner's present age reduces the probability of recidivism.
 "(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
 "(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release."
[5] On appeal, petitioner does not challenge the Rosenkrantz "some evidence" standard on the ground that federal due process requires a broader standard of review. Rosenkrantz itself had "no occasion to determine whether the same standard [of review] is also mandated under federal constitutional principles," and noted that "petitioner does not contend that the federal Constitution imposes a more stringent standard." (Rosenkrantz, supra, 29 Cal.4th at p. 658, fn. 12, italics added.) *Page 866